AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Kansas

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>a black Apple iPhone 12 assigned call number<br>(316) 755-5698, currently in the possession of the FBI<br>(Wichita Office) | )<br>)<br>)<br>)<br>)<br>)    Case No.   22-M-6330-01-KGG |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
a black Apple iPhone 12 assigned call number (316) 755-5698,  currently in the possession of the FBI (Wichita Office) further described in Attachment A

located in the _____ District of _____ Kansas _____ , there is now concealed *(identify the person or describe the property to be seized)*:

evidence of violations of 18 U.S.C §§ 1591(a), 2422(b), and 2251(a), as described in the Affidavit of Probable Cause, and as further identified in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1591(a) | Sex Trafficking of a Minor |
| 18 U.S.C. 2422(b) | Coercion/Enticement |
| 18 U.S.C. 2251(a) | Sexual Exploitation of a Minor/Production of Child Pornography |

The application is based on these facts:

See Attached Affidavit of Probable Cause.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Melissa Macaron, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed telephonically.

Date: **Dec 9, 2022**

_____
*Judge's signature*

City and state:  Wichita, KS

The Honorable Kenneth G. Gale
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF a BLACK APPLE IPHONE 12 ASSIGNED CALL NUMBER (316) 755-5698, CURRENTLY IN THE POSSESSION OF THE FBI (WICHITA OFFICE) | Case No.  22-M-6330-01-KGG |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Melissa Macaron, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

## I.    INTRODUCTION

### A.    Purpose of Affidavit

1.      As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a black Apple iPhone 12 assigned call number (316) 755-5698 and containing Verizon 5G SIM card 89148000008118394240 (the "TARGET PHONE"). As detailed below, this device is known to belong to and has been used by MINOR 1,[1] a minor victim in an ongoing investigation involving child exploitation.

---

[1] This affidavit anonymizes the identities of minors and witnesses by referring to them by initials or other generic terms.

3.      Your Affiant seeks authority to search the TARGET PHONE, as detailed in Attachments A, for the items described in Attachment B.  Attachments A and B are incorporated by reference herein.

4.      I am investigating the activities of Edward Wilson Zimmerman III ("ZIMMERMAN").  As shown below, there is probable cause to believe that ZIMMERMAN has engaged in sex trafficking of a minor, attempted to coerce and entice a minor to engage in sexual activity, and attempted to entice a minor to produce child pornography, in violation of 18 U.S.C. §§ 1591(a) (Sex Trafficking of Children by Force, Fraud, or Coercion), 2422(b) (Coercion and Enticement), and 2251(a) (Sexual Exploitation of Children) (collectively, the "Target Offenses").  Further, there is probable cause to conclude that evidence of the Target Offenses includes communications from ZIMMERMAN to MINOR 1 via the TARGET PHONE.  I request authority to search the TARGET PHONE in its entirety, where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of criminal activity.

B.      **Agent Background and Experience**

5.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since December 2020.  I am currently assigned to the Winchester Resident Agency out of the FBI Richmond Field Office.  I investigate a variety of violations, such as crimes against children, human trafficking, white collar crimes, bank robberies, and civil rights violations.  In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing victims, witnesses, and subjects; conducting physical surveillance; consensual monitoring; and analyzing records associated with social media accounts, IP addresses, and phone numbers.  Through my work, I have also talked to other investigators with experience

2

investigating child exploitation offenses and learned about the types of evidence typically gathered from the execution of search warrants.

6.     Prior to becoming a Special Agent with the FBI, I attended and graduated from Arizona Summit Law School. During law school, I focused my studies on federal criminal law and procedures. I passed the Uniform Bar Exam and am currently a member of the New Mexico State Bar. I attended the FBI Academy in Quantico, Virginia, where I was trained in a variety of investigative and legal matters, including topics of Fourth Amendment searches, probable cause, and preparing and executing search warrants.

7.     Since being employed with the FBI, I have participated in the execution of numerous search warrants, including those for cellular telephones, laptop computers, and online accounts, such as email accounts, online storage accounts, and other online communication accounts. In the course of my employment with the FBI, I have observed and reviewed examples of child pornography (as defined in 18 U.S.C. § 2256) in many forms of media. I am familiar with the types of evidence often found within cellular telephones and other electronic devices belonging to or used by victims of the Target Offenses, as well as other federal crimes. As a Special Agent, I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7).

**C.     <u>Sources of Information</u>**

8.     This affidavit is based in part on information that I learned from discussions with other law enforcement officers and on my own investigation of this matter. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed. Such

3

statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. Further, my interpretations and explanations of the significance of certain events, records, and statements discussed herein may evolve or change as the investigation progresses and/or new information is discovered. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the Target Offenses are presently located on the TARGET PHONE.

## II.     TARGET OFFENSES

9.      This investigation concerns alleged violations of 18 U.S.C. §§ 1591(a), 2422(b) and 2251(a), which relate to the sexual exploitation of minors.

10.      Under 18 U.S.C. § 1591(a)(1), it is unlawful knowingly to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, or solicit by any means a person in or affecting interstate commerce. Under 18 U.S.C. § 1591(a)(2), it is unlawful knowingly to benefit, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of § 1591(a)(1) knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or any combination of such means would be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of eighteen years and would be caused to engage in a commercial sex act.

11.      Under 18 U.S.C. § 2422(b), it is unlawful to use the mail or any facility or means of interstate or foreign commerce knowingly to persuade, induce, entice, or coerce any individual who has not attained the age of eighteen years to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense.

12.      Under 18 U.S.C. § 2251(a), it is unlawful to employ, use, persuade, induce, entice, or coerce any minor to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such

4

conduct, if such person knows or has reason to know that such visual depiction will be transported

or transmitted using any means or facility of interstate or foreign commerce or in or affecting

interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted

using materials that have been mailed, shipped, or transported in or affecting interstate or foreign

commerce by any means, including by computer, or if such visual depiction has actually been

transported or transmitted using any means or facility of interstate or foreign commerce or in or

affecting interstate or foreign commerce or mailed.

### III.   **PROBABLE CAUSE**

13.     In July 2022, D.S. provided information to the Federal Bureau of Investigation,

Internet Crime Complaint Center, that an individual named Edward ZIMMERMAN (hereinafter

"ZIMMERMAN") located in Winchester, Virginia, had been grooming D.S.'s fourteen-year-old

daughter (hereinafter "MINOR 1") and MINOR 1's fourteen-year-old friend (hereinafter "MINOR

2").

### A.   **MINOR 1's Communication with ZIMMERMAN, Including Suspected Electronic Communications via the TARGET DEVICES**

14.     D.S. was interviewed by your Affiant and an FBI Task Force Officer.  MINOR 1

currently lives with D.S.'s relative, G.B., in Kansas, but MINOR 1 and MINOR 2 spent some time

over the summer with D.S. in another state.

15.     During the interview, D.S. stated the following information: ZIMMERMAN sent

MINOR 1 money through Cash App.  MINOR 1 told D.S. that MINOR 1 had a "sugar daddy"

who sent MINOR 1 money through Cash App.  MINOR 1 had a Cash App card on which MINOR

1 received payments from different people, including a Cash App user with the username "Ed

Zmith," for various amounts of money.  The "Ed Zmith" Cash App account was associated with

phone number (540) 931-1879.  Law enforcement database records indicate that call number (540) 931-1879 is associated with ZIMMERMAN.

16.     Per D.S., G.B. asked MINOR 1 why "Ed Zmith" was paying MINOR 1.  MINOR 1 told G.B. that the money was for pictures of MINOR 1's feet.  Because of this situation, G.B. cancelled MINOR 1's Cash App account so that "Ed Zmith" could no longer send MINOR 1 money.

17.     Per D.S., MINOR 1 later received a new Cash App card[2] in the mail.  G.B. informed D.S. that G.B. was able to get into MINOR 1's new Cash App account when MINOR 1 did not have her phone.[3]  G.B. saw that the new Cash App account was created for MINOR 1 by ZIMMERMAN.  ZIMMERMAN created MINOR 1's new Cash App account by claiming that ZIMMERMAN was MINOR 1's parent.[4]  D.S. and G.B. believe that MINOR 1 continued to receive money from ZIMMERMAN on MINOR 1's new Cash App account following initiation of the new Cash App account because MINOR 1 was ordering food deliveries, and MINOR 1 did not have a job or any other way of receiving income to pay for the deliveries.

18.     D.S. believes that ZIMMERMAN sent MINOR 1 a sex toy through the mail.[5]  D.S. believes this sex toy was from ZIMMERMAN because the Amazon package containing the sex toy was addressed to MINOR 1 using a nickname from MINOR 1's Cash App account, rather than

---

[2] D.S. has provided the FBI with photographs of MINOR 1's new Cash App card, as well as payment transactions from "Ed Zmith" to MINOR 1.

[3] Through the investigation, agents confirmed that the TARGET PHONE was MINOR 1's cellular device via G.B. and law enforcement database records.

[4] It is significant that ZIMMERMAN approved a Cash App card for MINOR 1 in a "parent role" because it indicates that ZIMMERMAN is aware that MINOR 1 is a minor and cannot open her own Cash App account due to her age.

[5] Agents are still trying to verify that the sex toy was sent by ZIMMERMAN; however, during an interview with MINOR 2, MINOR 2 stated that ZIMMERMAN sent MINOR 1 two sex toys.

a name MINOR 1 typically uses when ordering Amazon packages. This package was sent to MINOR 1 when MINOR 1 was staying with D.S. D.S. burned the Amazon package and the sex toy and did not take pictures of this package.

19.     Later, MINOR 1 received a second Amazon package addressed to MINOR 1 in the same manner as the first package. This package was sent to MINOR 1 when MINOR 1 was back in Kansas. This package also contained a sex toy. D.S. believes that this sex toy was also sent to MINOR 1 from ZIMMERMAN. G.B. took photographs of the Amazon package and the sex toy inside and sent D.S. the photographs.[6]

20.     ZIMMERMAN and MINOR 1 have communicated through video calls using FaceTime. D.S. knows this because MINOR 1 borrowed D.S.'s iPad to talk to ZIMMERMAN and the FaceTime call log listed a conversation with ZIMMERMAN's phone number, (540) 931-1879 (the same number connected to the "Ed Zmith" Cash App account).[7] MINOR 1 told D.S. that ZIMMERMAN has old-looking hands. Per D.S., MINOR 2 was also present or three-wayed into some of the FaceTime calls between ZIMMERMAN and MINOR 1.

21.     G.B. and D.S. believe that MINOR 1 may have told ZIMMERMAN that law enforcement was looking into ZIMMERMAN after G.B. and D.S. became concerned about MINOR 1's interactions with ZIMMERMAN.

22.     In October 2022, MINOR 1 was interviewed by an FBI Child/Adolescent Forensic Interviewer ("CAFI"). During the interview, MINOR 1 stated that MINOR 1 talked to ZIMMERMAN on FaceTime and Snapchat. MINOR 1 stated that most of the time when they

---

[6] D.S. has provided the FBI with a photograph of the sex toy as well as the packaging.

[7] D.S. has provided the FBI a screenshot of the FaceTime log showing contact with ZIMMERMAN's phone number.

talked, ZIMMERMAN had the camera facing away from his face.  MINOR 1 saw his face only one time when ZIMMERMAN accidentally had the camera pointing toward his face.

23.     MINOR 1 stated that she and ZIMMERMAN communicated mostly on Snapchat and FaceTime and that MINOR 1 utilized her personal cellular phone (i.e., the TARGET PHONE) when they talked.

24.     During the forensic interview, MINOR 1 stated that she did not care if ZIMMERMAN went to jail.  When asked why ZIMMERMAN would go to jail, MINOR 1 stated that the FBI knows what ZIMMERMAN is doing, but MINOR 1 would not go into any further detail.  MINOR 1 told the forensic interviewer that ZIMMERMAN was a pedophile and MINOR 1 received money from ZIMMERMAN for that reason.  MINOR 1 did not elaborate in any further detail.  MINOR 1 also stated that the forensic interviewer knew what had happened between MINOR 1 and ZIMMERMAN, but MINOR 1 was not going to say it out loud.

25.     During a break in the interview when the interviewer stepped out of the room, MINOR 1 made a phone call.  A government employee overheard MINOR 1 speaking to an older male and relaying questions asked about ZIMMERMAN during the interview.  Based on MINOR 1's reluctance to detail ZIMMERMAN's conduct and the nature of the overheard conversation, it is believed that MINOR 1 called ZIMMERMAN to inform him of the interview.[8]

26.     G.B. stated that MINOR 1 used her cellular telephone to communicate with ZIMMERMAN.  G.B. also told FBI agents that MINOR 1 had a Chromebook laptop and that MINOR 1 may have used the Chromebook to communicate with ZIMMERMAN as well.

---

[8] Agents are still in the process of confirming that MINOR 1 called ZIMMERMAN during the forensic interview.

27.     In November 2022, G.B. gave MINOR 1's cell phone to FBI Kansas City.  The cell phone is currently located at the FBI resident agency office in Wichita, Kansas.

**B.     MINOR 2 Provides Corroborative Statements About ZIMMERMAN and MINOR 1**

28.     M.G., the mother of MINOR 2, was interviewed by your Affiant and an FBI Task Force Officer in August 2022.  Agents also interviewed MINOR 2.  M.G. and MINOR 2 reported that MINOR 2 received money from Cash App user "Ed Zmith."  MINOR 2 told M.G. that both MINOR 2 and MINOR 1 sent ZIMMERMAN pictures of themselves in exchange for money.  MINOR 2 did not tell M.G. what kind of photographs were being sent to ZIMMERMAN from MINOR 2 or MINOR 1.  Based on my training and experience, I know that minors are often reluctant to reveal information perceived as embarrassing or shameful, such as involvement in sexually explicit conduct and communication.

29.     M.G. stated that MINOR 2 told her that ZIMMERMAN was an older man who had wrinkly hands.   MINOR 2 said that ZIMMERMAN made her uncomfortable because ZIMMERMAN touched himself sexually during a video call with MINOR 2.  Based on my training and experience, I know that child predators will often be aroused by sexual conversation and sexual images of minors.  Here, MINOR 2's reports about ZIMMERMAN touching himself sexually during a video call is consistent with grooming or otherwise engaging in the Target Offenses.

30.     In October 2022, MINOR 2's mother, M.G., told an FBI Agent that MINOR 1 has threatened to disseminate sexually explicit photographs of MINOR 2 to MINOR 1 and MINOR 2's friends online.

C.      **Summary of Probable Cause**

31.      Based on my training and experience, I know that cellular devices, like TARGET PHONE, are often used interchangeably by users to send/receive messages, especially when the devices are "paired" through a common network or user profile.  For example, I know from training, experience, and common sense that individuals often back-up their photographs and videos on multiple digital devices, such as a cellular telephone and laptop.  Here, I believe there is probable cause to conclude that images, videos, and/or other communications involving the Target Offenses and occurring between ZIMMERMAN and MINOR 1 will be found on the TARGET PHONE, even if another device, such as a laptop, was used to draft or send a communication.  I also believe that there is probable cause to conclude that images, videos, and/or other communications involving the Target Offenses and MINOR 2 will be found on the TARGET PHONE, due to the apparent triangle of communication.

32.      Based on my training, experience, and knowledge obtained from other law enforcement officers, it is not uncommon for people to utilize different electronic devices to access their applications (such as Cash App or video messaging applications).  Therefore, it is likely that MINOR 1 used both her cell phone and laptop to communicate with ZIMMERMAN.  I also know that people often use multiple applications and platforms to transfer funds and make payments on electronic devices.  It is therefore likely that MINOR 1 utilized Cash App and other applications or platforms to send and receive payments and/or transfer funds related to the Target Offenses.

33.      Based on my training, experience, and knowledge obtained from other law enforcement officers, I also know that individuals involved in the Target Offenses often take steps to conceal criminal activity when they believe law enforcement may be aware of their involvement in criminal activity.  In their attempt to conceal their conduct, such individuals often participate in discussions about deletion of material or ways to conceal incriminating communications.  Based

10

on MINOR 1's communication with an older male during the October 2022 interview, I believe that it is likely that the TARGET PHONE will contain discussions about law enforcement or criminal investigations, discussions about deletion of material, or discussions about concealing incriminating communications.

34.     Based on my training, experience, and knowledge obtained from other law enforcement officers, I know that individuals involved in the Target Offenses often groom minor victims by initiating and developing sexual relationships with minors in order to obtain sexually explicit material from the victims.

35.     Based on the information detailed herein, I believe that MINOR 1 communicated with ZIMMERMAN in connection with the Target Offenses and evidence of ZIMMERMAN'S criminal conduct will be found on the TARGET PHONE.  I also believe that MINOR 1 sent ZIMMERMAN sexually explicit photographs in exchange for money.  It is likely that these communications or records of the communications between MINOR 1 and ZIMMERMAN are still contained in the TARGET PHONE.  Further, I believe that there is probable cause to conclude that ZIMMERMAN's communications with and directions to MINOR 1 likely includes behavior that involves grooming, inducing, enticing, or coercing MINOR 1 to produce or take part in sexually explicit conduct for purpose of producing a visual depiction of such conduct.  I also believe that there is probable cause to conclude that the TARGET PHONE will contain evidence of ZIMMERMAN's criminal activity involving MINOR 2.

## IV.     DEFINITIONS

36.     The following definitions apply to this affidavit and Attachment B:

a.     "Child pornography" includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit

conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

b. "Visual depictions" include undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format. *See* 18 U.S.C. § 2256(5).

c. "Child erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but are not, in and of themselves, obscene or do not necessarily depict minors in sexually explicit poses or positions.

d. "Minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

e. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person. *See* 18 U.S.C. § 2256(2).

f. "Computer" refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." *See* 18 U.S.C. § 1030(e)(1).

## V.      TECHNICAL TERMS

37.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Cellular telephone:   A cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other cellular telephones or traditional "land line" telephones.   A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, cellular telephones offer a broad range of capabilities.   These capabilities include storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading

information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

e. "Hardware" consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to hardware (including, but not limited to, physical keys and locks).

f. "Computer passwords and data security devices" consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data

security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

g. "Computer-related documentation" consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

h. "Software" is digital information that can be interpreted by an electronic device and any of its related components to direct the way it works. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

i. "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

j. The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, and paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, and photocopies); mechanical form (including, but not limited to, phonograph records, printing, and typing); or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, and electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media Cards ("MMCs"), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

k. FaceTime is an application that allows users to make audio and video calls with other FaceTime users.

l. Snapchat is a software application that provides users a way to share photos, videos, and chats. Snapchat is popular among users because it allows the photos, videos, and chats to disappear after a set amount of time.

m. Cash App is a mobile payment service that allows users to transfer money to one another using a mobile phone app.

14

38.     Based on my training, experience, research, and common sense, I know that individuals frequently use cellular telephones that serve as a wireless telephone, wireless text communication device, digital camera, portable media player, GPS navigation device, and mass storage data drive.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## VI.     ELECTRONIC STORAGE AND FORENSIC ANALYSIS

39.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

40.     *Forensic evidence.*  As further described in Attachment B, these applications seek permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrants, but also forensic evidence that establishes how a device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the TARGET PHONE because:

   a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.

Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

41. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of device consistent with the warrants. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrants.

## VII.   CONCLUSION

42. Based on the aforementioned factual information, your Affiant respectfully submits that there is probable cause to believe that evidence of criminal offenses, namely, violations of 18 U.S.C. §§ 1591(a), 2422(b) and 2251(a), is located on the TARGET PHONE and that this evidence, listed in Attachment B to this affidavit, constitutes evidence, fruits, and/or instrumentalities of the foregoing criminal offenses.

43. Your Affiant therefore respectfully requests that the attached warrants be issued authorizing the search and seizure of the items listed in Attachment B.

MELISSA MACARON
Special Agent
Federal Bureau of Investigation

Received by reliable electronic means and
sworn to before me over the telephone and

16

signed by me pursuant to Fed. R. Crim. P. 4.1
on this ___ day of December, 2022.


_____
HONORABLE KENNETH G. GALE
United States Magistrate Judge

17

## ATTACHMENT A

## TARGET DEVICE

The property to be searched is a black Apple iPhone 12 used by MINOR 1 and assigned call number (316) 755-5698, currently in the possession of the FBI (Wichita Office).

## ATTACHMENT B

## ITEMS TO BE SEARCHED AND SEIZED

1.      All records on the TARGET PHONE relating to violations of 18 U.S.C. §§ 1591(a),

2422(b) and 2251(a) (collectively, the "Target Offenses"), including but not limited to:

     a.   Information relating to who owned, possessed, used and/or exercised dominion or control over the TARGET PHONE;

     b.   Any and all child pornography, including any information which may be used to identify the minor depicted;

     c.   Any records or information indicating communication with or about ZIMMERMAN, or with or about MINOR 2, or related to ZIMMERMAN's illegal activities (identified above and as described in the Affidavit of Probable Cause), including but not limited to online conversations, calls, payments, and text messages;

     d.   Communications, images, or other data about sex toys, sex-related accessories, or discussions about receipt or mailing of packages;

     e.   Communications referring to law enforcement or a criminal investigation, including, but not limited to, discussions about deletion of material or communications and discussions about concealing incriminating communications.

     f.   Any records or information contained within applications involving payment functions, including information about the access to and transfer of funds within the application(s);

     g.   Records, documents, communications, photographs, and information related to the possession, production, or distribution of child pornography or grooming behavior;

     h.   Records of browsing history, including websites visited and data exchanged from/to those websites, relating to the production, sending, or receiving of child pornography, or relating to commercial sex acts;

     i.   Telephone numbers or other accounts used for outgoing or incoming telephone or video calls with ZIMMERMAN, MINOR 2, or other individuals involved in the Target Offenses;

     j.   Electronic address books, contact lists, telephone number lists, buddy lists, friend lists, or any other software program used for the electronic compilation of contact information;

     k.   Stored electronic communications, or alphanumeric messages, including but not limited to emails, videos, picture messages, text messages, instant messages, social

media messages, or voicemail, whether drafted, sent, received, opened or unopened, read or unread, and/or forwarded, discussing or relating to the sending of/receiving of child pornography;

l. Any records or information indicating the types, amounts, and prices of child pornography as well as dates, places, and amounts of specific transactions;

m. Any information related to sources or recipients of child pornography (including names, addresses, phone numbers, or any other identifying information); and

n. Any encrypted, deleted, and unallocated files on electronic media that contain any of the information listed above.

2.      Evidence of user attribution showing who used or owned the TARGET PHONE at the time the items described in this warrant were created, edited, transmitted, or deleted, including but not limited to logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.